UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JULIE M. BROWN,

        Plaintiff,

v.                                         Case No. 13-C-375

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

**DECISION AND ORDER**

This is an action for review of the final decision of the Commissioner of Social Security denying an application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 *et seq*., and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* Plaintiff Julie M. Brown claims that the Commissioner's decision should be reversed and remanded for three reasons: (1) the ALJ erred in failing to properly assign the medical opinion of her treating neurologist controlling weight; (2) the ALJ's credibility determination is not supported by substantial evidence; and (3) the ALJ's finding that Plaintiff was able to perform various jobs that exist in the national economy was not supported by the Vocational Expert's testimony. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

At the time she filed her application for disability benefits in May of 2010, Julie Brown was thirty-eight-years-old and lived with her fiancé and three children, ages fourteen, eight and two, in

Green Bay, Wisconsin. Ms. Brown had graduated from high school and completed a year-and-a-half of college. She had previously worked as a cashier, stocker, veterinary assistant, receptionist, and dog groomer, but had not been employed since on or about July 31, 2006, when she quit work to become a stay-at-home mom. (Tr. 161-62, 194, 110.) In her application, Ms. Brown claimed she was disabled as of September 2008 due to trigeminal neuralgia, a chronic nerve condition that can cause extreme, sporadic, sudden pain to the face. She also listed diabetes, a herniated esophagus, migraines, pain in the left side of her face, sinus problems and depression as physical or mental conditions that limited her ability to work. (Tr. 182.)

Ms. Brown's application for disability benefits was denied initially and on reconsideration, and she requested a hearing. (Tr. 128-35, 141-49.) On February 16, 2012, a hearing was held by video conferencing before Administrative Law Judge (ALJ) Ann Lunderman at which Brown, represented by counsel, and a vocational expert testified. (Tr. 106-23.)

At the time of the hearing, Ms. Brown was 5'1" tall and weighed 210 pounds, and she lived with her fiancee and three children, ages sixteen, ten, and four. (Tr. 109, 110, 223.) Ms. Brown testified that she was unable to work because her trigeminal neuralgia caused such severe face pain that she sometimes did not get out of bed for a day or two. (Tr. 110.) She stated that her medication caused "a lot of drowsiness" and jitters and shakiness in her right (dominant) hand. (Tr. 111.) Ms. Brown testified that during the day, she tried to be active, clean the house, and spend time with her children. (Tr. 111.) She also tried to make supper "most of the time." She used to walk her dogs, but her drowsiness and arm jerking made that task difficult. (*Id.*) Although she used to have a driver's license, she let it expire because she did not feel comfortable driving knowing that her arm might suddenly jerk. (Tr. 112.) Ms. Brown also explained that her fiancee helped her with "just

2

about everything." (Tr. 111.) For example, he would help her with pots on the stove, zippers, and tying shoes. (*Id.*)

Near the close of Ms. Brown's testimony, her attorney referenced a "Trigeminal Neuralgia Residual Functional Capacity Questionnaire" completed by Dr. Prasad Kanneganti, M.D.,[1] her treating neurologist, on June 7, 2011. Dr. Kanneganti indicated in the Questionnaire that as a result of the pain associated with her trigeminal neuralgia, Ms. Brown had a reduced ability to attend to and persist in tasks. She would be able to walk less that two blocks without rest or severe pain. She could sit and stand more than two hours at a time and sit and stand/walk for at least six hours in an eight-hour work day. (Tr. 690.) Dr. Kanneganti also opined that Brown's trigeminal neuralgia would cause her to miss about four days of work per month and take unscheduled breaks. (Tr. 692.) In response to her attorneys question whether she disagreed with any of Dr. Kanneganti's findings, Ms. Brown testified that she agreed with most of Dr. Kanneganti's findings, but she believed her condition would cause her to miss more than four days of work per month. (Tr. 113.) She estimated that she would miss at least one or two days of work per week and added that she "very rarely" had no pain. (*Id.*)

A vocational expert (VE) was also called to testify at Brown's hearing and responded to two hypotheticals posed by the ALJ. (Tr. 115-21.) In a decision dated April 2, 2012, the ALJ found Brown not disabled. (Tr. 34-35.) The ALJ found that Brown's trigeminal neuralgia was a severe impairment but did not meet a listing, and she found the rest of Brown's impairments to be non-severe because they were generally well-controlled by medication or proper diet and caused minimal

---

[1] Dr. Kanneganti is incorrectly referred to as Dr. Gilagante in the administrative transcript.

limitations. (Tr. 27-29.) At step four of the sequential process, the ALJ must determine the individual's residual functional capacity (RFC), or "what an individual can still do despite his or her limitations." S.S.R. 96–8p. The RFC represents the maximum a person can do, despite his limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013). Brown's RFC indicated that she could perform light work with the following functional limitations: able to lift and carry up to 20 pounds frequently and 50 pounds rarely; able to walk less than two city blocks at a time, but can sit and stand for more than two hours at a time; able to stand and walk a total of at least six hours in an 8-hour workday; able to sit a total of at least six hours in an 8-hour workday; able to twist, stoop and crouch frequently; limited to frequent use of the hands but can frequently use the right dominant hand for all types of manipulation including gross and fine; limited to work with simple, repetitive 1-2 step tasks. (Tr. 30.) Relying on the testimony of the VE, the ALJ concluded that Brown was not able to perform her past relevant work but was able to perform other jobs in the national economy, such as machine tender, parking lot cashier, and ticket seller. (Tr. 33-35.) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. Analysis

An ALJ's conclusion of no disability be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute

4

its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and her conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ must also "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.* The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

These are the principles that govern the court's review of the Commissioner's decision. With them in mind, the court now turns to Plaintiff's claims of error.

**A. Treating Physician Rule**

Plaintiff's primary argument is predicated on the "treating physician rule," which requires the Agency to give controlling weight to the opinion of a claimant's treating physician if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The reason for giving greater weight to the opinions of treating physicians is that they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may

5

bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

At the same time, "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has cautioned that treating physicians may bring their own biases to the evaluation. *See id.* ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, the ALJ need not blindly accept a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). If the ALJ discounts a treating physician's opinion, she must then determine what weight to give the opinion using the factors listed in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including the length of treatment, the physician's specialty, and the consistency and supportability of the opinion. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008). While the ALJ must use these factors to provide some explanation for her decision to discount a treating physician's opinion, federal court review is deferential: the ALJ's decision must stand as long as she has "minimally articulated" her reasons for rejecting the treating physician's opinion. *Elder*, 529 F.3d at 415.

The ALJ afforded "great weight" to the majority of the opinions expressed by Dr. Kanneganti in his Questionnaire, but she discounted two of his findings. (Tr. 32-33). Specifically, the ALJ afforded great weight to Dr. Kanneganti's opinions concerning Brown's functional limitations, including the number of hours she could sit, stand and walk each day, the amount of

weight she could lift, her limitations in concentration and persistence, her ability to twist, stoop, or crouch, and her ability to reach, handle, or finger objects. (Tr. 32.) The ALJ found these opinions "highly credible" because they were "well-supported by the clinical and diagnostic findings" and "not inconsistent with other substantial evidence of record." (Tr. 33.) In contrast, the ALJ afforded "little weight" to Dr. Kanneganti's opinions that Brown would be absent from work about four days each month[2] as a result of impairment symptoms or treatment and that she would need unscheduled breaks at an unknown duration and frequency. (Tr. 32, 691-92.) The ALJ afforded these opinions little weight because they were "inconsistent with clinical findings, the claimant's treatment frequency and activities of daily living." (Tr. 33.) She found that since Brown's symptoms were mostly controlled by medication, Dr. Kanneganti's opinion that she would miss four days of work per month was not substantiated. (*Id.*)

If Dr. Kanneganti's opinion is to be believed, then Brown is certainly disabled. In fact, the VE opined that more than one absence per month would preclude all competitive employment. (Tr. 119.) Brown contends the ALJ erred in discounting Dr. Kanneganti's opinion that Brown would miss four days each month because "[t]here is no diagnostic test or blood test that can accurately predict how many missed days of work per month a claimant may have. It is something that can only be assessed by a treatment provider who knows and understands the medical condition of the claimant." (Pl's Br. at 11, ECF No. 11.) Brown further argues that in order to discount Dr.

---

[2] The ALJ slightly mischaracterized Dr. Kanneganti's findings on the Questionnaire. The opinion states that Dr. Kanneganti estimated Brown would "be absent more than four days each month." (Tr. 33.) In fact, Dr. Kanneganti checked the box indicating that Brown would miss "About four days per month" and not the box that indicated "More than four days per month." (Tr. 692.) The error is immaterial because the VE opined that more than one absence per month would preclude all competitive employment. (Tr. 119.)

7

Kanneganti's opinion, the ALJ was required to make a specific finding as to the number of days of work Brown was likely to miss. The ALJ's failure to do so, Brown argues, constitutes error. (*Id.*)

The treating physician rule requires the ALJ to give controlling weight to the opinion of a claimant's treating physician *only* if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2) (emphasis added); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir.2011). Ms. Brown concedes that there are no diagnostic tests that can determine the number of days she will likely be absent from work due to her trigeminal neuralgia. Thus, for the rule to apply to Dr. Kanneganti's opinion about the number of days she would likely miss, his opinion must be well supported by medically acceptable clinical techniques and not inconsistent with other substantial evidence. It is noteworthy that Brown does not identify the medically acceptable clinical techniques that support Dr. Kanneganti's opinion since the absence of such evidence is one of the reasons the ALJ explicitly cited for discounting Dr. Kanneganti's opinion on this issue. (Tr. 33.) Unless Ms. Brown can point to the clinical findings that actually support Dr. Kanneganti's opinion, her argument that the ALJ erred in failing to accord it controlling weight lacks essential support. In fact, a review of the record provides ample support for the ALJ's finding that Dr. Kanneganti's opinion was not just unsupported by clinical evidence; Kanneganti's opinion was actually inconsistent with the clinical evidence.

The record shows that Dr. Kanneganti first saw Ms. Brown on a referral from her primary physician on September 24, 2008, for a "severe, lancinating, sharp, shooting type of pain involving the right side of the face in the distribution of the trigeminal nerve." (Tr. 345.) Dr. Kanneganti gave a differential diagnosis of trigeminal neuralgia and placed her on Tegretol. (Tr. 347-48.) Ms.

8

Brown reported "80-90% improvement" when Dr. Kanneganti saw her a little more than two weeks later. (Tr. 340.) The medical records indicate Ms. Brown continued to improve and by March 26, 2009, Dr. Kanneganti was reporting the condition was "in remission." (Tr. 332.) On June 17, 2009, Dr. Kanneganti reported that Ms. Brown "has had no further episodes of neuralgic pain on the right face. She is doing well with Tegritol, which she takes 200 four times daily and baclofen she takes 10 mg twice a day." (Tr. 325.)

When Dr. Kanneganti saw Ms. Brown for a follow-up six months later on December 21, 2009, he noted that the trigeminal neuralgia migrainous headaches were still in remission, and that Ms. Brown was "tolerating medications well." (Tr. 321.) Dr. Kanneganti next sees Ms. Brown on July 28, 2010, and again notes her trigeminal neuralgia is "in remission." (Tr. 492.) Although he notes she has been complaining of migrainous headaches, "her neuralgic pain has completely subsided." (Tr. 491.) There are no further reports or records by Dr. Kanneganti until the June 7, 2011 Questionnaire in which he opines she is likely to miss about four days of work per month because of her condition. (Tr. 692.) On the same day, Dr. Kanneganti also signed a letter "to whom it may concern" in which he notes that her symptoms include "severe, sharp, shooting type of pain on the right side of her face" and that her prognosis is "guarded as we are unable to prognosticate how the disease will progress." (Tr. 694.) Although the record does contain other medical records from other doctors who saw Ms. Brown during this period of time, none of them notes any complaints relating to her trigeminal neuralgia.

Based on this record, the ALJ's finding that Dr. Kanneganti's opinion that Ms. Brown would likely miss four days of work per month because of her trigeminal neuralgia was inconsistent with clinical findings and her treatment frequency is entirely reasonable. Indeed, it is difficult to see how

9

the ALJ could have reached any other conclusion. This opinion by Dr. Kanneganti was also inconsistent with the other substantial medical evidence in the case, including the opinions of both the non-examining state agency consultant and the consultative examiner, each of whom thought Ms. Brown capable of sustained employment. (Tr. 631, 641.) Given this record, the ALJ did not err in failing to give Dr. Kanneganti's opinion about the amount of work Ms. Brown would miss because of her condition controlling, or even any, weight.

Ms. Brown also argues that even if the ALJ was not required to give controlling weight to Dr. Kanneganti's opinions, she still failed to determine what weight to give the opinions using the factors articulated in 20 C.F.R. § 404.1527(c), including the length of treatment, the physician's specialty, and the types of diagnostic tests performed. (Pl's Br. at 10, ECF No. 11.) Brown contends the ALJ should have considered that Dr. Kanneganti is a specialist in neurology and afforded his opinion greater weight.

Although ALJ's are not required to consider every factor, it appears that the ALJ actually did consider this factor in rendering her decision. The ALJ noted that Dr. Kanneganti is a neurologist, gave most of his opinions controlling weight, and directly translated many of his findings into Brown's RFC finding. (Tr. 30, 32-33.) The ALJ only gave two of his opinions "little weight," and it is evident that the ALJ discounted these opinions based on the consistency and supportability factors. 20 C.F.R. § 404.1527(c)(3)-(c)(4). As noted above, the ALJ found these opinions inconsistent with clinical findings and not substantiated by Brown's treatment history. (Tr. 33.) Moreover, although the ALJ stated that she afforded Dr. Kanneganti's opinions concerning work absences and breaks "little weight," the treating physician rule does not require her to give any weight to either of these opinions. Whatever weight the ALJ did give Dr. Kanneganti's opinion

10

about the likelihood of Ms. Brown missing work, it is evident from the ALJ's RFC finding that it was outweighed by the remaining evidence, including Dr. Kanneganti's own findings that for more than two years since he began treatment for her, she had been in remission. The ALJ provided a "logical bridge" to explain her rationale for discounting the statements, and this is all that was required. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

### B. Credibility Determination

The ALJ found that Brown's statements concerning the intensity, persistence, and functionally limiting effects of her symptoms were "not fully credible." (Tr. 31.) Brown contends that the ALJ failed to properly address her subjective complaints regarding the side effects of her medications. (Pl's Br. at 12, ECF No. 11.) Beginning in January 2009, Brown complained of occasional jerking movements in her hands and body. (Tr. 338.) One month later, Brown again reported tremors and twitching in her hands. (Tr. 335.) On June 7, 2010, Brown submitted a function report indicating that the arm jerks significantly affected her ability to perform simple tasks like bathing, caring for her hair, shaving, cooking, and feeding herself. (Tr. 203-10.) In a consultative psychological examination with Dr. Robert Schedgick, Ph.D., on September 29, 2010, Brown reported that her right arm jerked about eight to ten times a day for approximately one to three or four minutes at a time. (Tr. 403.) She also reported shaking in the right arm that occurred four to five times each day and lasted between five and sixty minutes. (Tr. 403) At the hearing, Brown testified that these arm jerks prevented her from driving, cooking on the stove, performing simple tasks for her children like zipping zippers and tying shoes. (Tr. 111.) She also testified that because of these arm jerks, her fiancee helped her with "just about everything." (*Id*.) These

11

complaints were corroborated by the third party function reports submitted by Brown's fiancee, Matt Wallen, and her friend Nancy Hays. (Tr. 223-26.)

It is evident that the ALJ credited Brown's testimony concerning the jerking in her arm to some degree. The majority of the findings in Brown's RFC come directly from Dr. Kanneganti's questionnaire, but Dr. Kanneganti only listed drowsiness as a side effect of Brown's medications and did not find any limitations with reaching, handling, or fingering. (Tr. 690-91.) Despite the absence of hand limitations in Dr. Kanneganti's Questionnaire, the ALJ included in the RFC finding that Brown was "limited to frequent use of the hands but can frequently use the right dominant hand for all types of manipulation including gross and fine." (Tr. 30.) Thus, the ALJ did not completely disbelieve Brown's complaints about the jerking in her hands. The ALJ did not believe, however, that Brown's medications affected her in such a profound way that she could not perform light work or frequently use her dominant hand for all types of manipulation. Brown contends that the ALJ did not adequately support this finding.

In evaluating a claimant's subjective complaints, the ALJ must determine whether the claimant has established a medially determinable impairment which could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. § 404.1529(b). If step one is satisfied, the ALJ must then evaluate the credibility of the claimant's subjective symptoms as to the intensity, persistence, and functionally limiting effects. *See id.* § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence, including the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief

12

of pain or other symptoms; (6) any measures other than treatment used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See id.* § 404.1529(c)(3); S.S.R. 96-7p, 1996 WL 374186, at *2-3. An individual's statements about the intensity or persistence of his or her symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. S.S.R. 96-7p at *1. A court's review of a credibility determination is "extremely deferential," *Bates v. Colvin*, __ F.3d __, No. 3359, 2013 WL 6228317, at *4 (7th Cir. 2013), and a court will reverse the ALJ's determination only if it is "so lacking in explanation or support that it is patently wrong," *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). After concluding that Brown's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," the ALJ proceeded to apply the factors listed in 20 C.F.R. § 404.1529(c)(3). (Tr. 31.)

Brown is correct that the ALJ's credibility finding is deficient in some respects. In particular, the ALJ's analysis of Brown's daily activities lacked specificity and did not adequately summarize Brown's reported symptoms. Citing Brown's self-submitted function report and hearing testimony, the ALJ found that despite Brown's impairment, "she has engaged in a somewhat normal level of daily activity and interaction," and she noted that Brown's daily activities include housework, caring for children and pets, and preparing meals. (Tr. 32.) The ALJ stated that "[t]he physical and mental capabilities requisite to performing many of the tasks described above as well as the social interactions replicate those necessary for obtaining and maintaining employment." (*Id.*)

The Seventh Circuit has repeatedly cautioned ALJ's not to equate household chores with full-time employment, especially when the claimant has significantly qualified her ability to perform the household chores. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Hughes v. Astrue*,

13

705 F.3d 276, 278 (7th Cir. 2013). Here, the ALJ's generic descriptions of Brown's daily activities do not adequately account for her testimony that her fiancee helped her with "just about everything," from driving to tying her children's shoes. (Tr. 111-12.) Brown reported that she no longer walks her pets because of the arm jerks, and when cooking, her fiancee must do all the cutting and remove pots from the stove. (Tr. 230, 233.) When preparing a meal for herself, Brown reported that she makes cereal, sandwiches, hot pockets, hamburgers, and rice. (Tr. 230.) As for social interaction, Brown reported that while she used to attend church, go to the library, and regularly walk her dog, she does not go anywhere anymore. (Tr. 231, 233.) Given all of these qualifications, it was not reasonable for the ALJ to summarily conclude that Brown was engaging in the types of tasks and social interactions that would be typical of a full-time employee.

Thus, the ALJ's analysis of Brown's daily activities was flawed. The ALJ's treatment of Brown's work history was also less than ideal. The ALJ noted that at the hearing, Brown testified that she stopped working to care for her children at home. (Tr. 32.) In this case, such testimony has little or no bearing on Brown's credibility because she stopped working in 2006 and was not diagnosed with trigeminal neuralgia until September 2008.

But the analysis of Brown's daily activities and work history was only a small part of the ALJ's credibility determination. The ALJ first examined the objective medical evidence. (Tr. 31.) In doing so, she cited several reports contradicting Brown's claims that the side effects of her medications severely affected her daily functioning. For example, consulting physician Mary Sauvey, M.D., observed on February 28, 2011, that Brown "can grasp normally, with full strength and can manipulate clothing well . . . including buttons" and found no evidence of muscle atrophy, spasticity, rigidity, involuntary movement or tremors. (Tr. 31, 632.) On March 28, 2011, Dr.

14

Kanneganti found Brown to have no focal weakness, no lateralized neurological dysfunction, no ataxia, no tremors, and no rigidity. (Tr. 31, 666-67.) The ALJ then examined Brown's medication regimen and cited Dr. Kanneganti's observation in March 2011 that Brown's trigeminal neuralgia was well-controlled by medication and that she was "doing well" on a combination of Pamelor and Tegretol. (Tr. 32, 667.) She also cited the letter Dr. Kanneganti attached to his Questionnaire which indicated that Brown's medication dosages were recently increased to provide better relief. (Tr. 32, 694.) Notably, in the Questionnaire, Dr. Kanneganti only listed drowsiness as a side effect of Brown's medications and did not find any limitations with reaching, handling, or fingering. (Tr. 690-91.) These reports support the ALJ's finding that Brown's statements regarding the limiting effects of her medications were less than fully credible.

It is also worth observing that the ALJ did not cite evidence supporting a finding of no disability while ignoring evidence to the contrary. Brown does not identify any medical providers who considered Brown's arm jerking to be a significant problem or prescribed any additional treatment for it. In fact, Dr. Bouinyi saw Brown on three occasions between January and February of 2009, and he opined that the tremors in Brown's hands could be a side effect of her Tegretol but did not adjust the amount of Tegretol prescribed. (Tr. 335-39.) On September 29, 2010, Dr. Schedgick described Brown's symptoms as "mild tremors" and the tremors "appear to be very similar to an intention tremor with a very mild quivering." (Tr. 410.) Dr. Schedgick also observed that the tremors were not occurring spontaneously. (*Id.*) As with Brown's complaints of face pain, Brown's medical history lends little support to her subjective complaints about the severity of the jerking in her arm. Brown's medical providers reported some side effects from her Tegretol but did not indicate that the side effects caused significant limitations.

15

Of course, the evidence cited by the ALJ does not prove that Brown's complaints were exaggerated. But conclusive proof that a claimant is exaggerating the extent of her symptoms is not required. Such evidence is seldom, if ever, available. If in order to reject a claimant's testimony that she was unable to hold a job an ALJ was required to point to irrefutable evidence that she can, then few if any claims could be denied. An ALJ may not ignore a claimant's subjective reports regarding her symptoms, but a discrepancy between the claimant's description of her symptoms and that suggested by her medical history may suggest symptom exaggeration. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). Here, the ALJ appropriately relied on the objective medical evidence, Brown's treatment history, and her medication regimen to find that Brown's complaints were less than fully credible and that Brown could still frequently use her hands. *See Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013) (finding that although the ALJ's discussion of the claimant's daily activities was "far from ideal," the ALJ provided a sufficient basis for his credibility determination by observing the level of treatment the claimant received, discrepancies between the claimant's complaints of significant side effects and the lack of evidence regarding those symptoms in her doctor's treatment notes, and inconsistencies in the evaluations of reviewing physicians). The ALJ also thoroughly explained why she discounted the third party function reports submitted by Matt Wallen and Nancy Hays, as she indicated that these statements were not given under oath and appeared to be no more than a parroting of Brown's testimony. (Tr. 32.)

As a result, despite the errors noted above, the ALJ's credibility determination was not "patently wrong." *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). The ALJ's analysis

16

of the side effects of Brown's medications provides a sufficient logical bridge to explain why she found Brown's subjective complaints less than fully credible, and therefore the ALJ's credibility determination does not warrant remand.

### C. Vocational Expert (VE) Testimony

Brown's final argument is that the ALJ's findings at step five of the sequential analysis were not supported by the VE's testimony. If the ALJ finds that the claimant is unable to perform his or her past relevant work at step four, then at step five, the ALJ uses the claimant's RFC to determine whether the claimant can adjust to other work. 20 C.F.R. § 404.1520(a)(4)(v). The burden shifts to the Social Security Administration to provide evidence that other jobs which the claimant can perform with his or her RFC exist in significant numbers in the national economy. *Id.* § 404.1560(c). This is generally done through the testimony of vocational experts at the hearing. *Id.* § 404.1560(b)(2).

Brown contends that the VE's testimony was confusing and does not support the ALJ's conclusion that she is not disabled. The ALJ included a finding in her RFC that "[t]he claimaint is limited to frequent use of the hands but can frequently use the right dominant hand for all types of manipulation including gross and fine." (Tr. 30.) At the hearing, the ALJ first posed a hypothetical to the VE that did not contain any limitations on hand use. (Tr. 116.) The VE opined that a hypothetical individual with Brown's age, education and work experience would be able to work as a ticket seller, laundry worker, or mail clerk. (Tr. 117.) Brown's attorney then added to the hypothetical that the individual was limited to only frequent use of their hands. (Tr. 118.) The VE responded that such a limitation would undermine all of the positions. (*Id.*) Later in the hearing, the ALJ stated: "I'd like to go back to you [the VE] on the frequent use of hands. If we

17

added the right hand is the dominant hand and can frequently be used for all types of manipulation including gross and fine, would there be jobs available for an individual using the hypothetical?" (Tr. 119-20.) The VE opined that the hypothetical individual could work as an assembly machine tender, parking lot cashier, or ticket seller. (Tr. 120.) These are the jobs the ALJ found Brown capable of performing at step five of the sequential analysis. (Tr. 34-35.)

Brown and the Commissioner dispute the extent to which the ALJ's final hypothetical was building on the previous hypotheticals. Based on the ALJ's RFC, it is apparent that she believed the final hypothetical posited an individual who was limited to frequent use of both hands (as opposed to constant), but could frequently use the right dominant hand for all types of gross and fine manipulation. (Tr. 30.) As the Commissioner reads the transcript, when the ALJ used the word "added," she was adding an ability to the hypothetical individual who was limited to frequent use of the hands. If this is how the VE also understood the final hypothetical, then there was no error. While the VE initially opined that a limitation of frequent use of hands would "undermine all of the positions" previously referenced, the ALJ further clarified that the individual could frequently use the dominant hand for all types of manipulation, and the VE identified three jobs such an individual could perform. But Brown contends that in the final hypothetical, the VE was considering a hypothetical individual who could use the left hand constantly and the right hand frequently for all types of gross and fine manipulation. Under Brown's interpretation of the transcript, the ALJ did not indicate to the VE that she should still consider the individual to be limited to frequent use of both hands. If Brown is correct, then the VE's testimony does not directly support the ALJ's conclusions at step five of the sequential analysis.

18

Although the transcript is difficult to follow in some instances, the ALJ's instructions to the VE were sufficiently clear. Again, the ALJ stated: "I'd like to go *back to you [the VE] on the frequent use of hands*. If we *added* the right hand is the dominant hand and can frequently be used for all types of manipulation including gross and fine, would there be jobs available for an individual *using the hypothetical*?" (Tr. 119-20.) (emphasis added) Based on the phrasing of this question, it is sufficiently clear that the ALJ instructed the VE to start with the previous hypothetical containing a limitation to frequent use of hands, and then add that the individual could frequently use the dominant hand for all types of manipulation. Since a textual reading of the transcript supports the ALJ's conclusions, this court will not speculate that the VE may have somehow have been confused. No remand is necessary to clarify the VE's testimony.

### III. Conclusion

For the reasons given above, the decision of the Commissioner is affirmed. The clerk is directed to enter judgment accordingly.

**SO ORDERED** this   30th   day of December, 2013.

      s/ William C. Griesbach
      William C. Griesbach, Chief Judge
      United States District Court